IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LARRY D. NUNLEY,                                    CV 07-6132-MA

                Plaintiff,                          OPINION AND ORDER

        v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

        **RICHARD F. MCGINTY**
        PO Box 12806
        Salem, Oregon  97301
        (503) 371-9636

                Attorney for Plaintiff

        **KARIN J. IMMERGUT**
        United States Attorney
        **BRITANNIA I. HOBBS**
        Assistant United States Attorney
        1000 S.W. Third Avenue, Suite 600
        Portland, OR  97204-2902
        (503) 727-1053

        **DAVID M. BLUME**
        Special Assistant United States Attorney
        Social Security Administration
        701 5th Avenue, Suite 2900 M/S 901
        Seattle, WA  98104-7075
        (206) 615-2212

                Attorneys for Defendant

**MARSH, Judge:**

        The matter before the Court is named plaintiff, Larry D.

Nunley's, Social Security Complaint, seeking judicial review of a

final decision of the Commissioner of Social Security denying his applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), and Supplemental Security Income (SSI) under Title XVI of the Act. 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the Commissioner's decision is AFFIRMED, and this case is DISMISSED.

## BACKGROUND

Nunley filed for disability on January 23, 2004, alleging he became disabled beginning October 10, 2003 due to manic depression, borderline personality disorder, depression, problems with authority, and lack of motivation. At the time he allegedly became disabled Nunley was 24 years old. He has a Ninth grade education and past work experience as a door assembler, sawmill off-bearer, and a landscape laborer. Nunley last worked in June 2005 as a production worker.

Nunley's application was denied initially and upon reconsideration. On October 4, 2006 a hearing was held at his request before an Administrative Law Judge (ALJ), at which Nunley was represented by an attorney. On December 14, 2006 the ALJ found Nunley not disabled. On May 25, 2007 this became the Commissioner's final decision when the Appeals Council declined Nunley's request for review. *See* 20 C.F.R. § 422.210.

On appeal to this Court Nunley alleges the ALJ erred by: (1)

failing to evaluate whether Dysthymia was a severe impairment at step two of the sequential evaluation; (2) failing to assess whether Nunley's impairments were severe in combination, at step three of the sequential evaluation; (3) failing to provide legally sufficient reasons for rejecting the Global Assessment of Functioning (GAF) score and the functional limitations assessed by physician Steven Tackett-Nelson, M.D.; (4) failing to "define the functional limitations associated with a 'moderate' impairment; (5) failing to provide "medical support" for his assessment of Nunley's residual functional capacity (RFC), and including many "invalid" limitations in the RFC; (6) failing to provide germane reasons for rejecting the lay witness testimony of Nunley's mother and sister; (7) failing to provide clear and convincing reasons for rejecting Nunley's own testimony; and, (8) improperly including the job of "sawmill off-bearer" as Nunley's past work at step four of the sequential evaluation. I address these arguments, below, in the order they arise under the Commissioner's sequential evaluation.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner bears the burden of developing the record. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F.3d at 1039-40. If the evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

### **ALJ'S FINDINGS**

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v.*

*Yuckert,* 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof at steps one through four. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); 20 C.F.R. §§ 404.1512, 416.912. Each step is potentially dispositive.

Here, at step one the ALJ found Nunley had not engaged in substantial gainful activity since his alleged disability onset date. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

At step two the ALJ found Nunley had the following impairments, considered "severe" within the meaning of the regulations: major depressive disorder, personality disorder, and substance abuse disorder. *See* 20 C.F.R. §§ 404.1520(c); 416.920(c).

At step three the ALJ found Nunley's impairments did not meet or equal the requirements of a listed impairment, codified at 20 C.F.R. Part 404, Subpart P, Appendix 1, considered so severe as to automatically constitute a disability. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

The ALJ determined Nunley had the residual functional capacity (RFC) to perform work at any exertional level, with the following non-exertional limitations: simple, routine tasks; only occasional contact with co-workers and the general public; need for supportive supervision; and, no exposure to hazardous

settings in which conflict could result in injury.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e), 404.1545, 416.945, 404.1567, 416.967.

At step four the ALJ found Nunley remained capable of performing his past relevant work as a door assembler, landscape laborer, and sawmill off bearer.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

## DISCUSSION

### I.  Nunley's Credibility

Nunley aruges that the ALJ failed to provide clear and convincing reasons for rejecting portions of his testimony.

The ALJ is required to consider a claimant's testimony regarding subjective symptoms, such as pain or depression.  20 C.F.R. §§ 404.1529, 416.929.  However, the ALJ is not required to automatically credit the claimant's allegations, otherwise disability benefits would be available on demand.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Rather, once the claimant has produced objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptoms alleged, assuming there is no evidence of malingering, the ALJ can only reject a claimant's testimony for clear and convincing reasons supported by substantial record evidence.  *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Morgan v. Apfel*, 169 F.3d 595, 599 (9th Cir. 1999).

In this case the ALJ pointed to three principal reasons for concluding that Nunley's "statments concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible."

First, the ALJ noted that Nunley's history of medical treatment for his alleged mental disorders was very limited, and that Nunely did not have a history of psychiatric hospitalizations.  Though he was briefly treated in the emergency room in September 2004 after he took an overdose of lithium, he denied suicidal ideation at that time, stating that he took the pills "to get attention from his girlfriend."

Nunley interprets this finding to mean that "more than one hospitatlization is needed for [this] ALJ to find [Nunley] fully credible."  I am not persuaded by this interpretation.  John McDevitt, M.D., testified as a medical expert at the hearing that a psychiatrist would expect to see a history of psychiatric hospitalizations in a patient who has an intrinsic mental disorder.  The absence of this medical history in Nunley's case, coupled with his admitted use of methamphetamine during the period under review, led Dr. McDevitt to suggest to the ALJ that Nunley's mental problems are more likely extrinsic, or caused by his drug abuse.  The ALJ reasonably adopted this testimony to conclude that Nunley's sparse treatment history detracted from

claim that he is unable to work due to disabling mental impairments. Notably, Nunley failed to attend a neuropsychological evalaution schedule by the ALJ, which would have provided further clarification on his work-related mental limitations.

The ALJ also found that Nunley never completed substance abuse counseling or anger managment training, and that there were major gaps in his treatment history. Nunley contrarily contends that he is too mentally ill to complete substance abuse counseling, and that he is currently in treatment (as of December 2007). Nunley's treatment history after the date of the ALJ's decision is not relevant to whether the ALJ properly evaluated the evidence before him. Nunley's own admissions in the record that he quit attending anger management classes because he does not enjoy group settings undermines his claim that he was too ill to attend treatment during the period under review.

Second, the ALJ found that by Nunley's own account his symptoms decreased when he ingested the dosage of medication prescribed to him. In October 2004, for example, Nunley reported that his mood was more stable and he was less irritable since starting lithium and Zyprexa. Nunley contends that "the symptom reduction is not sufficient to allow [him] to work." This argument is easily rebutted by Dr. McDevitt's finding that

Nunley's blood work showed less than a therapeutic level of lithium in his system during the pendency of this prescription. Dr. McDevitt testified that this was either due to a metabolic condition, or medical non-compliance. In February 2005 Nunley reported to his treatment provider that he was not taking his medications consistently. Thus, the ALJ reasonably concluded from this record that when Nunley was medically compliant his symptoms were dramatically reduced.

Third, the ALJ noted many inconsistencies between Nunley's stated limitations and other evidence in the record. For instance, the ALJ found that Nunley had not been forthcoming about the extent of his substance abuse. In February 2006 he stated that he had remained clean and sober since his release from jail in November 2003, yet the record indicates that Nunley tested positive for methamphetamine on September 8, 2004. At the hearing on October 4, 2006 Nunley told the ALJ that he was uncertain when he last used drugs or how frequently he used them becuase "it's not something I just go around and remember dates of when I used and didn't use." Moreover, Nunley refused to submit to a random drug screen requested by the ALJ.

Nunley also inconsistently reported on his actitivites of daily living. On his disability application Nunley indicated that he lived with his parents all his life because he is unable

to care for himself.  However, the record reveals that Nunley lived with his fiance and her family for a period of time before she called off the engagement, at which point Nunley moved back in with his parents.  Moreover, at the hearing Nunley and his mother revealed that Nunley actually lives in a mobile home on his family's property, that he prepares his own meals when his mother is not around to cook for him or when he wants to avoid his father, and that he does not perform other household chores due to lack of motivation and lack of skill, not because of any medically determinable impairment.

Lastly, Nunley reported that he was found to be a "potential threat to children" after being evaluated by the Oregon Department of Human Services due to his proximity to his mother's in-home childcare business.  However, the ALJ found this report inconsistent with Nunley's statement that during this same time period he occasionally cared for his girlfriend's young child.

In summary, I find these to be clear and convincing reasons supported by substantial record evidence to discredit Nunley's subjective reporting.

## II.  Medical Evidence

Nunley argues that the ALJ improperly accorded "little weight" to the opinions of psychologists B. Scot Cook, and Nancy

Nelson, and failed to provide legally sufficient reasons for rejecting the Global Assessment of Functioning (GAF) score and functional limitations assessed by Steven Tackett-Nelson M.D.

## A.   B. Scot Cooke, Psy.D.

On March 20, 2004, B. Scot Cooke, Psy.D.[1], performed a Comprehensive Pscyhodiagnostic Examination at the request of Disability Determination Services (DDS).  Cooke diagnosed Nunley with several clinical disorders.  The principal diagnosis was Major Depressive Disorder, Recurrent, Severe, with Psyhotic Symptoms.  Cooke also diagnosed Nunley with: (1) Dysthymic Disorder; (2) Alcohol Dependence (state of remission unknown); (3) Cannabis Dependence (state of remission unknown); and, (4) Amphetamine Dependence (state of remission unknown).  He noted that Nunley's "recent breakup of engagement" was a psychosocial/ environmental problem.  Cooke diagnosed Nunley with a GAF level of 35, which is meant to indicate "Some impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *See* DSM-IV 30 (4th ed. 1994).

Cooke did not administer any psychological testing to arrive at these diagnoses, nor did he review Nunley's medical charts.

_____

[1] Although the parties refer to Cooke as a doctor he is not a Ph.D. or an M.D.

Instead he credited Nunley's report of "a rather dreary daily existence," stating that Nunley's daily activities consisted of feeding his pets, working on his car, playing basketball and visiting friends occasssionally, and hunting and fishing "when he can." Cooke noted that Nunley has "an active Oregon driver's license and a vehicle" and that he is "fully capable of handling his own dress, grooming, and hygiene." He opined that Nunley had "substandard level[s] of motivation, independence, or desire to pursue future goals," and that a "probable contributor to poor performance in both academic and employment domains was [Nunley's] chronic and heavy polysubstance dependence." Based on these findings, Cooke concluded that Nunley was, at that time, "a poor candidate for employment."

The ALJ gave "little weight" to Cooke's findings or his opinion about Nunley's employment potential. The ALJ found Cooke's narrative report to be internally inconsistent with the GAF level he attributed to Nunley. The ALJ also found Cooke's diagnoses undermined by his inability to determine whether Nunley's polysubstance abuse was in remission.

The Commissioner evaluates the opinion of a nontreating, examining physician and/or psychologist based on (1) medical specialty and expertise with the Social Security rules,

(2) supporting evidence in the case record, (3) supporting

explanations provided by the physician or psychologist, and

(4) any other relevant factors.  20 C.F.R. §§ 404.1527(e),

416.927(f).  To reject the opinion of a psychologist that

conflicts with another acceptable medical opinion contained in

the record, the ALJ must give specific and legitimate reasons

based on substantial evidence.  *Winans v. Bowen*, 853 F.2d 643,

647 (9th Cir. 1987).

I find the reasons the ALJ gave for rejecting Cooke's

opinions to be specific and legitimate, and supported by

substantial evidence.

**B.  Nancy Nelson, Psy.D.**

On June 23, 2004, Nancy Nelson, Psy. D.[2], conducted a

psychological evaluation of Nunley to evaluate "concerns of

safety risk if he is around day care children."  Nunley's mother

ran a childcare program out of her home, and after Nunley was

charged with menacing on November 17, 2003, Department of Human

Services became involved.  Nelson's purpose was not to evaluate

Nunley's work-related functional limitations, nevertheless, in a

letter dated August 5, 2004, titled "Clinical Statement Regarding

Claimant's Work-Related Mental Abilities," Nelson opined that

---

[2] Although the parties refer to Nelson as a doctor she is
not a Ph.D. or an M.D.

based on her findings from the June 23, 2004 psychological evaluation Nunley would be unable to sustain "adequate work behaviors" due to his "personality disorder symptoms."

Nelson's sources for the June 23, 2004 psychological evaluation included interviews with Nunley and his mother, "exchange of phone call messages with [Nunley's] sister," a police report summary from November 17, 2003, a review of B. Scot Cooke's report (discussed above), and the results of three psychological tests she administered.

The November 17, 2003 incident involved Nunley violently threatening to kill his mother and sister in the presence of children. His mother told Nelson that she escaped the house with the children, called 911, and had Nunley arrested. Nunley was jailed for two weeks, and prohibited from seeing his family for a period of time immediately thereafter. He was eventually allowed to move back into his parents' home under a "no wrongful conduct order" and with the condition that he complete a 12 week anger management class. Nunley dropped out of the class after approximately 5 sessions.

Nunley and his mother told Nelson that he often threatens suicide, is violent with his family, had only recently begun taking psychiatric medication as prescribed, seems to "cycle" every three to four months when "he gets too high for several

days, then crashes and is very depressed," is antisocial and agoraphobic.  Nunley reportedly began using drugs, alcohol and tobacco at age 13.

Nelson diagnosed Nunley with a host of clinical disorders, including: (1) Major Depressive Disorder, Recurrent, Moderate with Psychotic Features; (2) Dysthymic Disorder; (3) Amphetamine Dependence; and (4) Cannabis Dependence (7 months clean).  Nelson also diagnosed Nunley with Borderline Personality Disorder and Antisocial Personality Disorder.  She credited Nunley's report of a Migraine Headache condition, and noted that Nunley had pychosocial and environmental problems, including "Problems with Primary Relationships; Legal problems; Unemployment."  Finally, Nelson assessed Nunley with a GAF level of 35.  *See* DSM-IV 30 (4th ed. 1994).

The ALJ gave Nelson's findings "little weight."  The ALJ found Nelson's diagnosis and conclusions about Nunley's ability to work were inconsistent with her own test results showing Nunley to be unreliable.  The ALJ pointed out that the "validity scales" on the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2) Nelson administered "indicated a high probablity of excessive random responding, making the test non-interpretable."  When Nelson called Nunely for an explanation, Nunley "gave opposite answers on many [of the questions she

repeated]...denied intentional random responding and had no idea how his answers on the test came out wrong on those items." On the Sentence Completion Test (SCT) Nunley responded "I don't know" to several questions, and his answers to others indicated a "depressed mood/outlook and hostility toward others." Finally, on the Brief Symptom Inventory (BSI) Nunley's "highest scores reflected significant paranoia with more moderate concerns with phobic anxiety and hostility." I find these to be specific and legitimate reasons to reject Nelson's opinion.

### C. Steven Tackett-Nelson M.D.

Psychiatrist, Steven Tackett-Nelson M.D., supervised the counseling of Nunley by therapist Rick R. Swope at Valley Mental Health in 2005 and 2006. While most of Swope's chart notes are illegible, a typed report dated March 6, 2006, indicates that Swope and Tackett-Nelson assessed Nunley with multiple clinical disorders, including: (1) Bipolar I Disorder, Most Recent Episode Depressed, Moderate in partial remission; (2) Cannabis Dependence in sustained full remission; (3) Amphetamine Dependence in sustained full remission; (4) Attention Deficit/ Hyperactivity Disorder, Combined Type by history; (5) Personality Disorder NOS. They also listed the environmental stressors listed by Cooke and Nelson, and assessed Nunley with a GAF level of 41-50, signalling

"Serious symptoms OR serious impairment in social, occupational, or school functioning."

On a check-the-box worksheet that Scope and Tackett-Nelson both signed they assesed Nunley with no more than mild limitations in most work-related functions, but "moderate" to "severe" limitations in his ability to "accept instructions and respond appropriately to criticism from supervisors," and his ability to "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." *See* DSM-IV 30 (4th ed. 1994).

The ALJ gave these opinions "little weight" because he found them "inconsistent with the accompanying report that claimant had experienced good outcome with prescribed medication and he appeared to be 'choosing to modulate his emotions and subsequent behaviors toward reasonable life goals and is learning and practicing cognitive and behavioral strategies.'"

Nunley argues the ALJ wrongly overlooked that Swope and Tackett-Nelson only gave Nunley a "fair" prognosis. He also argues that the ALJ ignored the GAF level of 41-50. I do not find any merit to these arguments, and in any event I conclude that the reasons the ALJ gave for discrediting the limitations assessed by Swope and Tackett-Nelson are specific and legitimate.

**III. Lay Witness Credibility**

According to Nunley, the ALJ failed to provide germane reasons for rejecting the lay witness testimony of his mother, Glenda Nunley, and his sister, Sherri Ormande.

Lay witness testimony as to a claimant's symptoms or how an impairment affects his ability to work is competent evidence, which the ALJ must take into account. *See Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)(finding the ALJ erred by failing to account for lay witness testimony about a claimant's serious coughing problems); *see also Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). However, medical diagnoses, such as that the claimant has a serious mental impairment as the result of a stroke, are beyond the competence of lay witnesses and therefore they do not constitute competent evidence. *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984); *cf. Nguyen*, 100 F.3d at 1467 (distinguishing lay witness testimony about a claimant's symptoms from testimony involving medical conclusions or diagnoses). The ALJ is required to account for competent lay witness testimony, and if he rejects it, to provide germane reasons for doing so. *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001).

## A.  Glenda Nelson

The ALJ found Glenda Nunley's testimony at the hearing regarding the behaviors she has observed Nunley exhibiting to be

generally credible. However, the ALJ rejected her concludsion that Nunley is incapable of working because of his anger management issues. The ALJ determined that Glenda Nunley had a co-dependent relationship with Nunley, evinced by her history of being less than forthcoming to the authorities about Nunley's problematic behavior, enabling his unproductive lifestyle by providing him with free room and board, choosing not to call the police when Nunley stole property from Glenda Nunley and her husband, and generally failing to set good boundaries with Nunley. The ALJ also noted that Glenda Nunley was unable to say whether Nunely was still using drugs, and therefore her conclusions about what causes Nunley to behave the way he does is not reliable. Finally, the ALJ observed that Glenda Nunley was "in a position to gain" from Nunley's receipt of disability benefits because he is currently completely dependent upon her and her husband for financial support.

Nunley argues that the ALJ wrongly discredited Glenda Nunley's testimony "for her inability to prove" that Nunley had not used drugs in a year. I do not find any merit to this argument, and I do find that Glenda Nunley's uncertainty about Nunley's drug use is a germane reason to discredit her opinion that he is disabled by mental impairments.

Nunley also argues that the ALJ's finding that Glenda Nunley has a co-dependent relationship with her son relies on "a non-

examining physician whose testimony is not substantial evidence."
Nancy Nelson is the "physician" Nunley is referring to.
Ironically, Nunley contends above that Nancy Nelson's opinion
that Nunley would be unable to sustain "adequate work behaviors"
due to his "personality disorder symptoms" does constitute
substantial evidence. Nunley can not have it both ways. In any
event, I find this to be a germane reason to find Glenda Nelson's
reports less than fully credible.

**B. Sherri Ormande**

Nunley's sister, Sherri Ormande, submitted a third-party
questionnaire dated March 15, 2004, in which she stated that
Nunley has difficulty with concentraion and attention and gettng
along with co-workers and supervisers, and that he cooks for
himself when his parents are out of town.

The ALJ found Sherri Ormande's observations generally
credible, and stated that the RFC he assessed for Nunley
accounted for the limitations Sherri Ormande reported.

Nunley argues the ALJ could have extrapolated more
functional limitations from Sherri Ormande's reports, such as
"the need for reminders, the need to be given other tasks when
Plaintiff becomes upset, the need to be move away [*sic*] from co-
workers and supervisors when Plaintiff becomes upset with these
individuals, the need for a lower production level than other
workers due to the failure to complete tasks, etc." Since the

ALJ did not discredit Sherri Ormande's testimony in the first place I do not find any relevance to this argument.

## IV.  Step Two

Nunley complains the ALJ erred by failing to include his alleged dysthymic disorder among Nunley's "severe" impairments at step two of the sequential evaluation.

The Commissioner argues that any error in leaving out this disorder at step two was harmless because the ALJ found that Nunley did have the similar, but more severe, impairment of Major Depressive Disorder.  According to the Commissioner, any work-related functional limitations associated with Nunley's alleged dysthymia were automatically included in the RFC assessment under the work-related functional limitations associated with Major Depressive Disorder.

Nunley, however, contends the alleged error was not harmless because it also affected step three of the sequential evaluation, when the ALJ allegedly failed to consider Nunley's Major Depressive Disorder and Dysthymic Disorder in combination, which Nunley contends would have met the criteria for Listed Impairment 12.04 (discussed further, below).

In order to prove an alleged impairment is "severe" the claimant must show (i) that he suffers from a "medically determinable physical or mental impairment," and (ii) that the medically determinable impairment significantly limits his

physical or mental ability to do basic work activities. *See* 20
C.F.R. §§ 404.1504, 404.1520(c), 416.904, 416.920(c); *see also*
*Edlund*, 253 F.3d at 1159-60.

To show a "medically determinable physical or mental
impairment" the claimant must proffer "medical evidence
consisting of signs, symptoms, and laboratory findings," not
simply his own subjective statement of symptoms. 20 C.F.R. §§
404.1508, 416.908. If the claimant makes such a showing, he must
also prove the impairment significantly limits his ability to:
walk, stand, sit, lift, push, pull, reach, carry, handle,
understand, carry out and remember simple instructions, use
judgment, respond appropriately to supervisors, co-workers, and
usual work situations, and/or deal with changes in a routine work
setting. 20 C.F.R. §§ 404.1521, 416.921. An impairment is not
severe if it has no more than a minimal effect on the claimant's
ability to do these types of activities. *See* SSR 96-3p.

The ALJ found that Nunley did have medically determinable
mental impairments that had more than a minimal effect on his
ability to do basic work activites, but due to Nunley's history
of drug abuse the ALJ was unable to determine with the degree of
precision necessary to differentiate between Major Depressive
Disorder and Dysthimic Disorder which disorder Nunley had.
Therefore, the ALJ gave Nunley the benefit of the doubt and found
he had the more severe of the two disorders. The ALJ explained

that he came to this conclusion after carefully evaluating the
medical evidence, including the testimony of Dr. McDevitt who
helped to interpret this evidence.  The ALJ adopted Dr.
McDevitt's testimony that Nunley clearly had an affective
disorder, a personality disorder, and a substance abuse disorder.
However, he concluded that "the exact nature of [Nunley's]
affective disorder is unclear" because "Dr. McDevitt opined that
[Nunley's] affective disorder is likely the result of long-term
methamphetamine abuse.  He further testified [that Nunley] has a
longstanding personality disorder that could be intrinsic or a
residual of substance abuse."

Nunley argues that these conclusions are flawed because they
are based upon the similarly flawed premise that Nunley had a
substance use/abuse disorder during the period under review.
Nunley incorrectly asserts that he has not used drugs since
before his alleged onset date of October 23, 2003.  As already
noted, above, when Nunley went to the emergency room after
intentionally ingesting an overdose of lithium, the urine screen
was positive for methamphetamine.  Moreover, Nunley himself
testified that he could not say for sure when he last used drugs
because he does not keep track of dates.

In summary, I find the ALJ properly concluded that Nunley
did not meet his burden, at step two, of showing that Dysthymia
was one of his "severe" impairments.

## V. Step Three

According to Nunley, the ALJ erred at step three by failing to consider the combined affect of Major Depressive Disorder and Dysthymic Disorder, which he claims meet the criteria of Listed Impairment 12.04, though he does not offer any specific argument in support of this claim.

At step three of the sequential evaluation the ALJ assesses whether a claimant's impairments meet or equal the criteria of an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, all of which are considered so severe as to automatically constitute disability without regard to any further consideration of claimant's age, education, and/or work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see also Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990). The claimant bears the burden of proving his impairment(s) meet or equal one of these "Listed Impairments." The ALJ "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *See Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005). The mere diagnosis of a listed impairment is not sufficient to sustain a finding of disability. *See Key v. Heckler*, 754 F.2d 1545, 1549-50 (9th Cir. 1985).

To prove his impairments equaled Listed Impairment 12.04
(Affective Disorders) Nunley had to prove he meets the
requirements of (A) and (B), or (C), below.

(A) Medically documented persistence, either continuous or
intermittent, of one of the following:

(1) Depressive syndrome characterized by at least
four of the following:

(a) Anhedonia or pervasive loss of interest
in almost all activities;
(b) Appetite disturbance with change in
weight;
(c) Sleep disturbance;
(d) Psychomotor agitation or retardation;
(e) Decreased energy;
(f) Feelings of guilt or worthlessness;
(g) Difficulty concentrating or thinking;
(h) Thoughts of suicide;
(i) Hallucinations, delusions, or paranoid
thinking.

(2) Manic syndrome characterized by at least three
of the following:

(a) Hyperactivity;
(b) Pressure of speech;
(c) Flight of ideas;
(d) Inflated self-esteem;
(e) Decreased need for sleep;
(f) Easy distractability;
(g) Involvement in activities that have a
high probability of painful consequences which are not
recognized;
(h) Hallucinations, delusions or paranoid
thinking.

(3) Bipolar syndrome with a history of episodic
periods manifested by the full symptomatic picture of both
manic and depressive syndromes (and currently characterized
by either or both syndromes).

(B) Resulting in at least two of the following:

(1) Marked restriction of activities of daily living;
(2) Marked difficulties in maintaining social functioning;
(3) Marked difficulties in maintaining concentration, persistence, or pace;
(4) Repeated episodes of decompenstion, each of extended duration.

(C) Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of abiility to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

(1) Repeated episodes of decompensation, each of extended duration;
(2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;
(3) Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ found that while there was medical evidence showing Nunley exhibited some of the A criteria, a review of the B criteria "indicates the functional limitation categories are not manifested at a degree that satisfies the full requirements of such listing." Further, with respect to the C criteria the ALJ found that "although an argument could be made [that Nunely] meets the criteria of listing 12.04C3 for an affective disorder that results in a 'current history of one or more year's inability to function outside a highly supportive living arrangement with an indication of continued need for such an

aragement'. . .the evidence of record is not consistent with a finding claimant is unable to function outside his current living arrangement and requires such a living arangement."

I find the ALJ adequately evaluated whether Nunley's credible functional limitations from both severe and non-severe impairments met or equaled Listed Impairment 12.04.

## VI. RFC

Nunley argues the ALJ's assessment of his residual functional capacity (RFC) is flawed because it containes many "invalid" limitations, and it does not include all the functional limtations assessed by Dr. Tackett-Nelson, discussed above.

A claimant's RFC is an assessment of what he can still do despite his limitations. Social Security Regulation (SSR) 96-8p. The ALJ assesses a claimant's RFC by reviewing all relevant evidence in the record, including testimonial and medical source statements, to determine the extent to which his medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his capacity to do work. SSR 96-5p. The ALJ need not include limitations based on a claimant's properly discredited subjective complaints (*Bayliss v. Barnhart*, 427 F. 3d 1211, 1217 (9th Cir. 2005)), or properly discredited medical opinions (*Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).

In this case, the ALJ determined that Nunley had the capacity to work at any exertional level, with the following non-exertional limitations: simple, routine tasks; only occasional contact with co-workers and the general public; need for supportive supervision; and, no exposure to hazardous settings in which conflict could result in injury.

Since Nunley does not explain which of these limitations he believes to be "invalid," I do not find any merit to this claim. I further find that the ALJ properly excluded limitations contained in properly discredited testimonial and medical evidence.

## VII. Step Four

Nunley's final objection is to the ALJ's finding at step four of the sequential evaluation that Nunley remains capable of performing his past relevant work as a door assembler, a landscape laborer, or a sawmill offbearer. According to Nunley, the ALJ should not have even considered the sawmill offbearer job because it was performed in a "sheltered setting." *See* 20 C.F.R. §§ 404.1573(c), 416.973(c)(work performed under special conditions that take into account a claimant's impairment may not show that the claimant has the ability to do substantial gainful activity).

As the Commissioner points out, it was not necessary for the ALJ to determine whether Plaintiff's sheltered work as a sawmill

offbearer constituted substantial gainful activity because Nunley
had also performed this job in a non-sheltered setting within the
past 15 years.  *See* 20 C.F.R. §§ 404.1560(b)(1),
416.960(b)(1)(defining "past relevant work" as work a claimant
has done within the past 15 years long enough to learn the job,
at a "substantial gainful activity" level).  Accordingly, I do
not find any merit to Nunley's objection, but I do find
substantial evidence supports the ALJ's finding that Nunley
failed to meet his burden of showing he could no longer perform
his past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv),
416.920(a)(4)(iv).

## **CONCLUSION**

Based on the foregoing, the Commissioner's decision is
AFFIRMED and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 28_ day of March, 2008.

/s/  Malcolm F. Marsh
Malcolm F. Marsh
United States District Judge
